## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| KAREN MARTÍNEZ LÓPEZ,<br><br>Plaintiff,<br><br>v.<br><br>CONSERVATORIO DE MÚSICA DE PUERTO RICO; MARIA DEL CARMEN GIL VENZAL, HER HUSBAND DOE-GIL AND THEIR CONJUGAL LEGAL PARTNERSHIP; ABC INSURANCE COMPANY, INC.<br><br>Defendants. | CIVIL NO.<br><br><br>JURY DEMAND<br><br>Title VII of the Civil Rights Act; National Origin Discrimination; Retaliation; Unjust Dismissal; Damages<br><br><br>DEMAND FOR JURY TRIAL |

### COMPLAINT

**TO THE HONORABLE COURT:**

**COMES NOW** the Plaintiff, Karen Martínez López, through her undersigned attorneys, and respectfully **AVERS, STATES** and **PRAYS**:

### I.    NATURE OF ACTION

1.    This is an action brought by Karen Martínez López, hereinafter "Karen", seeking compensatory relief and damages as she has been the subject of intentional discriminatory treatment as a result of a pattern and practice of national origin discrimination while working at the Conservatorio de Música de Puerto Rico.

2.    Karen has also been subjected to interference of her legally protected rights and retaliation by her former employer, the Conservatorio de Música de Puerto Rico, hereinafter referred to as "CMPR", for engaging in a legally protected activity. Such actions, described herein, are without justification, unreasonable and arbitrary.

3.     Plaintiff seeks the following remedies: injunctive and equitable relief; an award of compensatory and punitive damages, front pay and back pay, mental anguish and benefit losses, as well as costs, litigation expenses and attorneys fees.

## II.     JURISDICTION AND VENUE

4.     This is a Civil Action for damages, this Court has subject matter jurisdiction pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e, *et. seq*., and 28 U.S.C. §1331, in that the claims involve Federal Question jurisdiction. Supplemental Jurisdiction is invoked by the Plaintiff to hear and decide pendent claims arising under local laws to wit: Puerto Rico Act No. 100 of June 30, 1959; Puerto Rico Act No. 115 of December 20 of 1991; Puerto Rico Act No. 45 of April 18 of 1935; Act No. 80 of May 30 of 1976; and Articles 1802 and 1803 of the Civil Code of Puerto Rico.

5.     This Court has jurisdiction over this matter pursuant to 28 U.S.C.A. §§ 1331 and 1343 since this is an action arising under the Constitution and laws of the United States to recover compensatory and punitive damages resulting from the deprivation of plaintiff's federal rights and privileges.

6.     Plaintiff Karen Martínez López, has complied with all the jurisdictional prerequisites to an action under Title VII, as follows:

a.     On August 30, 2011, she filed a Charge of Discrimination, hereinafter "Charge", with the Equal Employment Opportunity Commission ("E.E.O.C."), alleging that she had been discriminated against because of national origin. This charge was given the following number: 515-2011-00515.

2

b.      On September 2, 2011, she filed a second Charge of Discrimination with the EEOC, alleging she had been discriminated against because of disability and national origin discrimination. This charge was given the following number: 515-2011-00521.

c.      The E.E.O.C., forwarded to Plaintiff Karen Martínez-López, the Notice of Right to Sue  for both charges, dated September 4, 2014.

7.      Venue is proper pursuant 28 U.S.C.A. § 1391 (a). This is the judicial district where the events or omissions giving rise to the claim occurred.

## IV. PARTIES

8.       Karen, is of legal age, married, and resident of Estancias de San Rafael, A-17, Trujillo Alto, Puerto Rico 00976. She started working for the CMPR on June 4, 2001. Karen is Puerto Rican.

9.      Co-Defendant the CMPR, was at all times relevant Karen's employer, which address is 951 Ave. Ponce de León San Juan, Puerto Rico 00907. The CMPR is a recipient of federal funds.

10.      Co-Defendant María del Carmen Gil Venzal, was Plaintiff's Supervisor at all times relevant to this Complaint. She is being sued in her personal capacity, as is her husband, Doe-Gil, and their Legal Conjugal Partnership. Their personal address is unknown. However, Mrs. Gil's work address is the following: 951 Ave. Ponce de León, San Juan, Puerto Rico 00907.

11.      Co-defendant Insurance Company ABC is upon information and belief, an insurance company providing coverage to any and all co-defendants for the claims alleged herein.  At this time, the identity of this insurance company is unknown. However, the Insurance Code of Puerto Rico provides for a direct action against an insurer for the acts of its covered insured's. Plaintiff believes that upon initial discovery, the identity of this company will be

ascertained, and the caption of the case will be amended for inclusion of the correct co-defendant insurer.

12.     The Defendants have engaged in unlawful, illegal, intentional discriminatory, intentional retaliatory and abusive acts, which have deprived the Plaintiff of her property without due process of law and without just compensation in violation to the Constitution and the laws of the United States of America. As a result, their actions and omissions have caused the Plaintiff the damages alleged in the complaint.

13.     At all times relevant herein, Karen was an employee of CMPR within the meaning of the applicable statutes, who fulfilled duties for Defendant.

14.     CMPR is an employer under the cited federal statutes, and receives federal funds by way of federal grants, which monies are used to pay for all of the wages of Karen herein while she was employed.

a).  The contract upon which CMPR receives the above funds contains a compliance clause with state and federal legislation.

b).  The CMPR was required to adopt policies to prohibit discrimination in the employment, including disability related and national origin discrimination.

### V.  FACTS COMMON TO ALL CAUSES OF ACTION

15.     Plaintiff, Karen Martínez López, began working for the CMPR, on June 4, 2001 as Director of Human Resources. She held that position until September 1, 2011, when she was unjustly dismissed while she was receiving treatment at the Puerto Rico State Insurance Fund for an accident she had suffered at work on September 13, 2010.

16.     Since Karen started working for the CMPR and at all times relevant, Co-Defendant Mrs. Maria del Carmen Gil, hereinafter referred to as "Gil" or "Chancellor", was the

Chancellor of the CMPR. Gil had been appointed to that position on February 1, 1998. Mrs. Gil, who is Cuban, always placed Cubans and/or other non-Puerto Rican persons in managerial positions, where they played active roles in the institutions' decision-making.

17.     Throughout her employment, Karen noticed that Mrs. Gil had a clear bias towards Cubans and foreigners. Mrs. Gil showed a pattern of favoritism for foreigners, which were evident in her hiring practices.

18.     At the time Karen was employed by the CMPR, four (4) of the five (5) Deans at the institution were foreigners and all were hired by Mrs. Gil. Only the Dean of Academic Affairs was Puerto Rican. The only consultant who was hired by Gil for a strategic planning project, Mr. Ernesto de la Torre, was Cuban. Mr. De la Torre was hired even though there were other persons in Puerto Rico, with the same preparation that could have performed the same duties at a lower cost for the CMPR.

19.     The CMPR not only had a practice of hiring non-Puerto Rican employees to supervisory and teaching positions, but these employees received benefits and compensations that no other similarly situated Puerto Rican employees received.

20.     For example, Professor Eddie Marcano, who was hired as Academic Professor, is a Venezuelan national who received a higher salary than any other similarly situated Puerto Rican. He also received compensatory time for hours worked in excess of 37.5 hours a week. No other professor accumulated compensatory time.

21.     Professor Germán Céspedes, a Colombian who was hired by the CMPR as Director of the Preparatory School and Professor of wind instruments, as well as Professor Luis Fred, a Cuban, who was appointed without following establish procedures were selected, by Gil

over Puerto Rican professors, even though they lacked the knowledge, experience and necessary capacity to hold their positions, which Puerto Rican professors had.

22.     Puerto Rican professors, such as Professor Nelson Corchado González, Efrén "Francho" and Orlando Maldonado, complained to the CMPR that they should have been hired instead of foreign professors because they had more knowledge, experience and capacity than they did to fulfill the duties of their positions. However, in retaliation for having presented their claims, the CMPR assigned them less hours to work and their contracts were not renewed.

23.     Professor Oscar Espina, a Spanish professor, was hired as an Assistant Professor to occupy the position of professor for the Clarinet, when other Puerto Ricans, who had applied for the job and had previously worked for the CMPR, were denied said position. The CMPR used to cover Professor Espina's travel expenses to New York and back to Puerto Rico once a month, and he was sometimes paid in full for hours not worked, while other professors, such as Puerto Rican Professor Henry Hutchinson, first violin of the Symphonic Orchestra of Puerto Rico was denied accommodations by Mrs. Gil for his travel to and from the Museo de Ponce, where he also worked.

24.     In fact, the Department of Human Resources of the CMPR received discrimination claims where Professor Espina's appointment was put in question, but Mrs. Gil ordered Karen not to attend to such complaints.

25.     While Karen worked for the CMPR, over thirty five (35) foreign employees were hired as professors by the CMPR over Puerto Rican professionals who had more experience, knowledge and capacity.

26.     Mrs. Gil's bias toward foreign professionals was keenly evident in her treatment of Mr. Juan Carlos Hernandez, who is also Cuban, and was hired as the Dean of Administration

and Finance on May 18, 1998. Mr. Juan Carlos Hernandez was second in the line of command of the CMPR. Although Karen did not report directly to him, he was copied of all communications Mrs. Gil sent to Karen.

27.     Mr. Hernandez was the only employee who received a salary increase in 2006 in the midst of a fiscal crisis prevailing in the government during the administration of Hon. Aníbal Acevedo Vilá. His salary increase was $6,156.00 per year during a full fiscal crisis due to "a revision of the pay scale of reliable service" when there was no review, and his was the only salary that was "revised". At that time, the working hours of several contract employees were reduced in order to cut operating expenses. Also Mr. Hernandez was the only person who received the payment of excess vacation leave scheduled in 2004 along with the Chancellor.

28.     As Director of Human Resources, Karen complained of this clear bias because only Mr. Hernandez was granted these benefits mentioned above, while others similarly situated Puerto Ricans, did not receive them. Only Hernandez and Gil, both Cuban nationals, received the payment in excess of regular license. In reply to Plaintiff's complaint, the Chancellor stated that Mr. Hernandez had received these benefits because he had the most seniority. However, Karen, as Human Resources Director, knew that this information was false. There were others employees with more seniority than Mr. Hernandez who did not receive any of these benefits.

29.     Due to multiple complaints from employees against Mr. Hernandez, which included performance issues, as well as harassment and hostile work environment, Karen, as Director of the Human Resources Department, had to carry out an investigation. When she informed the Chancellor of such complaints, the Chancellor advised Karen to hear the complaints but that she had to nonetheless "close the case" and take no action, disciplinary or otherwise. Because the Chancellor's instruction was not deemed appropriate to Karen, she asked

an opinion from the attorney of the CMPR, as to what to do. She was advised by the attorney that notwithstanding the Chancellor's caveat, she had to carry out the investigations, as part of her duties and responsibilities as Director of Human Resources.

30.     Karen carried out and concluded the investigation, and prepared a written report of her findings. The investigation revealed and the report reflected that the employees of the administration and finance departments of the CMPR, as well as the employees of the physical plant operations had complained about the close relationship Gil had with Mr. Hernandez, about Mr. Hernandez' undue influence upon the Chancellor and that they were afraid to complain for fear of retaliation.

31.     When Karen handed the report dated October 31, 2006 to Gil, she informed her that there was a perception of disparate treatment among all the staff and told her furthermore that everyone knew that she and Mr. Hernandez were Cuban and that she (Karen) understood that there was favoritism because of Mr. Hernandez' national origin, because the above mentioned work-related benefits were only granted to him. The Chancellor rebuked Karen for her comments, for disobeying her instructions, for not having "closed the case", as instructed, and for drafting a report against Mr. Hernandez. The Chancellor told Karen that that was not an issue that concerned her, and because she had went ahead with the investigations and prepared a report she (Karen) would suffer the consequences.

32.     Subsequently, Mr. Hernandez resigned on February 23, 2007 to his position. After his resignation, the Chancellor told Karen that Mr. Hernandez' resignation had been her fault, for having drafted the abovementioned report against Mr. Hernandez, who she loved as her son.

33.     After Karen conducted the investigation and voiced her complaints of discrimination because of national original, Mrs. Gil stopped communicating in person with Plaintiff, and she only communicated with her electronically or in writing. Before that, the informal and person-to-person conversations between the two (2) were constant.

34.     After Mr. Hernández resigned, Mrs. Gil started giving Karen new assignments not related to her functions as the Human Resources Director. One of the assignments was to be the personal assistant of Professor Eddie Marcano, a Venezuelan national. Karen was put in charge of finding him a home in Puerto Rico, look for schools for his children, make arrangements for vaccines, look for transportation and other personal arrangements for Mr. Marcano, that were not under her duties and responsibilities as Director of Human Resources, but more akin to an assistant or butler.

35.     Subsequently, on October 4, 2010, Mr. Hernandez returned to the institution, despite the complaints filed against him in the past, which had caused discomfort to those employees who had threatened to unionize. When Mr. Hernández returned, Mrs. Gil assigned him to the same position as Dean of Administration and Finance, the same position he held before resigning.

36.     When Mr. Hernandez assumed once again his position, Karen knew that his appointment would further affect her in her work, because Mrs. Gil had already made threats against her for his resignation.

37.     As soon as Mr. Hernandez took up office, Mrs. Gil began to take action upon her threats. She stripped Karen of several of her duties and responsibilities. She brought Ms. Alba Davila, who was the CMPR's former Director of Human Resources, as an Assistant Director, hired as an "independent contractor". The classification plan of the CMPR does not provide for

the existence of an Assistant Director in the Department of Human Resources, and less as an "independent contractor".

38.     Although all Assistant Directors in other departments report to their respective Department's Director, in this case, Mrs. Davila did not report to Karen, as would be customary, but reported directly to Mrs. Gil. The Chancellor granted Mrs. Davila all the authority to replace Karen and to perform the duties of her position when she was absent, as publicly announced by Mrs. Gil.

39.     Mrs. Gil hired Mrs. Dávila to occupy said position through a "professional services contract" in order to threaten Karen with the fact she had someone willing and able to perform her job and to take her position at any time.

40.     Although when Mrs. Dávila was first hired, Mrs. Gil informed Karen that she was to work for only a month, the fact is that Mrs. Davila continued working for the CMPR and she continued to report directly to Mrs. Gil and never to Karen, at least until Plaintiff was dismissed.

41.     After Mr. Hernandez started working again at the CMPR, Mrs. Gil started to give Karen unjust reprimands. Mrs. Gil unlawful treatment and harassment in retaliation against Plaintiff was evident even to her coworkers.

42.     On October 26, 2010, after being on sick leave under the State Insurance Fund (SIF), Karen returned to work. During a meeting she held with Mrs. Gil, Karen was stripped of various functions such as being in charge of employee contracts and matters related to teaching personnel. Gil spoke to Plaintiff in a hostile tone, and demanded to know the reason why she had gone to the SIF. She insulted Plaintiff and threatened her. She told Karen that she did not expect her trust personnel to take sick leave under the SIF. Even though Mrs. Gil demanded

explanations, she did not let Karen speak and kept interrupting her. Karen started to cry while Mrs. Gil kept on screaming at her. Karen left the meeting feeling nervous and tearful.

43.     Mrs. Gil not only questioned Karen's reasons for having gone to the SIF during the meeting described above, but she sent various emails to Plaintiff requesting her to deliver her documents related to her sick leave under the SIF, even though the information requested had already been sent to Mrs. Gil.

44.     Afterwards, Mrs. Gil started to reprimand Plaintiff in written communications, copying administrative personnel. She wrote that Karen did not know to perform various of her functions and reprimanded her unjustly.

45.     Karen was excluded during meetings held by Mrs. Gil with administrative personnel, and was also excluded from trust employees' interviews, employees who were under her responsibilities. Karen was also excluded from other employee personnel matters, and processes related to amendments to CMPR's rules and regulations, matters she had routinely performed in the past.

46.     On November 18, 2010, Mrs. Alba Dávila, Assistant Director of the Human Resources Department told Plaintiff that she knew that Mrs. Gil and Mr. Hernandez had "declared war against her" and that they wanted to fire her. Specifically, Mrs. Dávila told Karen "why do you think that Gil excludes you of work-related matters and is always reprimanding you?" Mrs. Dávila further told Karen that Mrs. Gil's unlawful retaliatory treatment towards her became evident to her (Dávila) when they held a meeting where Mrs. Dávila, Mrs. Gil and Plaintiff were present, after Plaintiff came back from the SIF. Mrs. Dávila told Plaintiff that she witnessed how she was unjustly being mistreated by Mrs. Gil at that meeting.

47.     Mrs. Dávila kept on asking Plaintiff, "why do you think Gil stripped you of some of your functions, such as being in charge of the Faculty, or the employee retirement issues? (a task which Mrs. Gil assigned to Mrs. Dávila)". Mrs. Dávila even told Plaintiff that she had noticed how Mr. Hernández preferred to work with her (Dávila) on human resources issues, instead of Plaintiff, even though Plaintiff was the Director of Human Resources and was more experienced in these respects.

48.     In retaliation and as a discriminatory practice, Mrs. Gil stripped Karen of her duties regarding the following: screening and interviewing of trust employees, and gave those duties to Mrs. Davila; for several months she also took from Plaintiff the duties of reviewing payroll; the Americorps' project; her participation in Mrs. Gil's staff meetings; the review of Human Resources' regulations and institutional policies; addressing issues of retribution and classification plans of career and trust employees; removed her from her position as Chair of the Ethics Committee of the CMPR, a position she kept until 2011; and forbade her from communicating directly with the legal advisor of the institution, Rafael Alonso, among other adverse employment actions.

49.     On April 11, 2011, Karen encountered Mrs. Gil face to face while Karen was descending the stairs at the CMPR and in the presence of two (2) other employees, Mrs. Gil physically shoved Karen to the side to get her out of her way. Karen was shocked by Mrs. Gil's physical reaction.

50.     Karen was not invited to participate at meetings in which she usually participated as Director of Human Resources. Serious personnel issues that Karen informed Mrs. Gil about pertaining HR issues were totally ignored by her.

51.     Around the beginning of 2011, the Board of Directors of the CMPR began an investigation based on a request that the faculty of the CMPR had asked them to make and because there had been a finding of mismanagement of the CMPR by the Office of the Comptroller of Puerto Rico ("Contralor"). The Faculty of the CMPR was concerned with the decisions Mrs. Gil had made regarding various issues, such as the administration of educational philosophy; Mrs. Gil's priority of the Project 100 x 35, adopting the Venezuela model; her mishandling of personnel transactions; poor working environment and others. During its investigation, the Board interviewed the teachers and other staff, as well as contract staff, and management personnel.

52.     On April 13, 2011, the Board met with the staff, without the presence of the Mrs. Gil. That day, the Vice President of the Board of Directors of the CMPR, Mr. Rafael Irizarry, asked who was the Director of Human Resources and who was in charge of contracts. Karen told him that she was the Director of Human Resources, but that all contracts had been assigned to Ms. Alba Dávila. Mr. Irizarry said publicly that Karen was responsible in the end of the day for all of those contracts. Karen clarified to Mr. Irizarry that she had been stripped of those functions by Mrs. Gil because she believed that those contracts did not comply with the requirements of the Office of the Comptroller, that she had informed Mrs. Gil of her opinion and that Mrs. Gil had done nothing to put those contracts in order. Karen's concerns where expressed in a letter she sent to Mr. Irizarry after that meeting.

53.     After the meeting, Karen questioned Mr. Irizarry as to why he blamed her for a role that she had been stripped off by Mrs. Gil. Among other issues, she also told Mr. Irizarry of the harassment, discrimination and the retaliation that existed in the institution because of  Mrs. Gil, among other irregularities.

54.     That day when Karen went to the bathroom, she encountered Mrs. Gil, who told her that she had heard that she had spoken to Mr. Irizarry, and that she also spoke with Mrs. María Cristina Firpy, President of the Board of Directors of the CMPR, that she had given too much information regarding the Comptroller's audit, and that she did not forget what she had done to Mr. Hernández for having investigated the complaints against him. Mrs. Gil told Karen that she was going to pay dearly for all of that and that she (Gil) would make sure of that.

55.     On April 20, 2011, Karen went to the State Insurance Fund due to an existing condition of a work-related accident she had had at the CMPR on September 13, 2010. While she was at the SIF, she was immediately deprived of access to the institutions' computers.

56.     On August 30, 2011, Karen filed a claim of national origin discrimination against the CMPR, whereby she claimed she had been discriminated against by Mrs. Gil and the CMPR because of national origin and recounted all the facts that precede this paragraph.

57.     Karen was on sick leave under the SIF until September 1, 2011, when she asked for reinstatement. That same day she was dismissed from her employment.

58.     Prior to returning to work, Mrs. Gil illegally interfered with Plaintiff's rights under the SIF by asking SIF personnel to reject Plaintiff's entitlement to treatment and protection.

59.     Karen was dismissed from her employment while she was still receiving treatment before the SIF. Due to her health condition, Karen went to the State Insurance Fund on September 21, 2010. On September 1, 2011, the SIF authorized Karen to work while receiving treatment with the SIF. That same day Karen tried to return to work at the CMPR. However, the employer did not allow her to work and instead fired her that same day. These actions of the employer deviated from the clear and unambiguous provisions of Puerto Rico Act No. 45, *supra*,

which requires the employer to reserve the employment of an injured worker for twelve (12) months and reinstate them in their position when the SIF authorizes the employee to return to work and the employee requests reinstatement, and were also in retaliation for having complainned.

60.     On the other hand, federal and state statutes prohibit employers from discriminating against employees or fire them, because they have offered or attempt to offer verbally or in writing any testimony, expression or information before a legislative, administrative or judicial forum in Puerto Rico. Karen was dismissed in retaliation for having filed a claim of discrimination before the EEOC.

61.     Karen was dismissed from her employment, in retaliation, also for having opposed the Defendants' discriminatory and retaliatory practices, as described above.

62.     In the alternative, Karen was dismissed from her employment because she went to receive treatment under the SIF.

63.     Defendants' retaliatory practices reached Karen while she was working for another employer after being dismissed by the CMPR. Through one of its agents and/or employees, the CMPR called Karen's new employer to inform it that she had allegedly illegally collected from the CMPR her Christmas Bonus, when this was not true. It was Defendants' intention to retaliate against Karen by calling into judgment before her new employer Plaintiff's morals, work ethics and professionalism, which had the intentional effect of trying to affect Karen in her employment.

64.     The incidents described above denote the materially adverse employment actions Defendants made against Karen, which caused her severe mental anguish and economic damages. After a thorough assessment of the incidents and the time of their occurrence, it is

evident that existed a deliberate intention of the Defendants to unlawfully discriminate against Karen, in retaliation, because she sought treatment before the SIF, among other incidents.

## VI. CAUSES OF ACTION

### First Cause of Action

65.     Plaintiff repeats, reiterates and re-alleges each and every allegation contained in paragraphs 1 through 64, as if set forth in full herein.

66.     This First Cause of Action arises under Title VII; and Puerto Rico Act No. 100 of June 30 of 1959, as well as other applicable statutes.

67.     Defendant CMPR, its agents, servants and/or employees, by their actions and omissions intentionally, willfully and without justification, deprived the Plaintiff of her rights, privileges and immunities secured by the Constitution, and the laws of the United States, particularly her right to be free from discrimination in the work place and retaliated against her.

68.     Karen was the victim of national origin discrimination, as described above.  Not withstanding repeated and multiple claims of discrimination, the CMPR refused to take any action to protect her from further acts of discrimination.  Such actions and omissions on the part of the CMPR caused and continue to cause significant emotional harm in damages entitling her to compensatory damages.

69.     Defendants discriminated and took adverse employment against Karen because of her national origin. She was treated differently than foreign employees.

70.     Defendants have engaged in unlawful and willful employment practices and have discriminated and taken adverse employment actions against Plaintiff on account of her national origin.

71.     As a direct result of the aforementioned unlawful discrimination, the Plaintiff suffered severe mental, psychological, moral and emotional pain, anguish and distress, and has sustained a loss of happiness, loss of the capacity to enjoy life, a diminishment of the capacity to love and an impairment of the capacity to perform the activities common to a woman of her age and sex. Plaintiff is entitled to receive, as a just and fair compensation for the afore stated damages, the maximum compensatory amount allowed by 42 U.S.C. § 1981a.

72.     Furthermore, Defendants engaged in the unlawful employment practices in question with malice or reckless indifference to the federally and State protected rights of the Plaintiff.

73.     Hence, pursuant to 42 U.S.C. § 1981a, the plaintiff is entitled to receive an award for punitive or exemplary damages, which will serve as punishment and deterrence for such unlawful employment practices.

74.     In addition, pursuant to 42 U.S.C. § 2000E-5(k), rule 54(d)(1) of the Federal Rules of Civil Procedure and 28 U.S.C. Sec. 1920, the Plaintiff is entitled to be awarded the costs to be incurred in this suit, plus reasonable attorney's fees.

75.     As a result of her employer's discriminatory actions, Plaintiff is entitled to back pay, liquidated damages, double damages, punitive damages, prejudgment interest, reasonable attorneys fees and court costs, as well as front pay, in an amount of no less than $1,000,000.00. Plaintiff demands that Judgment be entered in her favor and against the defendant, granting her an amount of no less than $1,000,000.00 in compensatory and punitive damages, plus a reasonable amount of attorney's fees, the costs of this action, and pre-judgment and post judgment interest, and any other further relief as is just under the circumstances.

## Second Cause of Action

### Retaliation

76.    Plaintiff repeats, reiterates and re-alleges each and every allegation contained in paragraphs 1 through 75, as if set forth in full herein.

77.    This Second Cause of Action arises under Puerto Rico Act No. 100 of June 30, of 1959; Puerto Rico Act No. 115 of December 20 of 1991; Act No. 45 of April 18 of 1935, as well as other applicable statutes.

78.    Karen was subjected to unlawful conduct by Defendants in retaliation for having engaged in protected conduct after and as a consequence for testifying in an administrative proceeding against defendants' interests and/or after she informed her employer that she was being discriminated against; and/or after having gone to the SIF.

79.    Defendants took retaliatory actions against Karen with respect to her terms, conditions and privileges of employment because of her protected participation.

80.    Defendants illegally interfered with Plaintiff's legally protected rights by communicating directly with the SIF to convince them to reject Plaintiff's case and further interfered by calling into question Karen's ethics alleging she had illegally cashed her Christmas bonus check.

81.    As a direct result of Defendants' unlawful employment practices, Karen is suffering and will continue to suffer severe mental, psychological, moral and emotional pain, anguish and distress, and has sustained a loss of happiness, and a loss of the capacity to enjoy life.

82.    Defendant, its agents, servants and/or employees, by their conduct herein alleged, intentionally, willfully and without justification, with malice or reckless indifference to the

18

federally protected rights of Karen, deprived Plaintiff of her rights, privileges and immunities secured by the Constitution, and the laws of the United States and Puerto Rico, particularly her right to be free retaliation in the work place.

83.     Karen was the victim of intentional reprisal and retaliation when the Defendants commenced retaliatory practices against her after she opposed the employer's retaliatory practices and for filing of a discrimination claim before the EEOC.

84.     The retaliatory practices included, but were not limited to altering the work conditions of Karen, by taking away her responsibilities, and by dismissing her from her employment, among other retaliatory actions.

85.     As a direct result of the aforementioned unlawful discrimination, Karen suffered severe mental, psychological, moral and emotional pain, anguish and distress, and has sustained a loss of happiness, loss of the capacity to enjoy life, a diminishment of the capacity to love and an impairment of the capacity to perform the activities common to a woman of her age and sex. Plaintiff is entitled to receive, as a just and fair compensation for the aforestated damages, the maximum compensatory amount allowed by 42 U.S.C. § 1981a.

86.     Furthermore, Defendants engaged in the unlawful employment practices in question with malice or reckless indifference to the federally and State protected rights of the Plaintiff.

87.     Hence, pursuant to 42 U.S.C. § 1981a, the plaintiff is entitled to receive an award for punitive or exemplary damages, which will serve as punishment and deterrence for such unlawful employment practices.

88.     In addition, pursuant to 42 U.S.C.§. 2000E-5(k), rule 54(d)(1) of the Federal Rules of Civil Procedure and 28 U.S.C. Sec. 1920, the Plaintiff is entitled to be awarded the costs to be incurred in this suit, plus reasonable attorney's fees.

89.     Plaintiff demands that Judgment be entered in her favor and against the defendant, granting her an amount of no less than $1,000,000.00 in compensatory and punitive damages, plus a reasonable amount of attorney's fees, the costs of this action, and pre-judgment and post judgment interest, and any other further relief as is just under the circumstances.

90.     The Plaintiff requests that the Court award any other damages permitted by law.

### THIRD CAUSE OF ACTION
### VIOLATION OF ARTICLE 1802 OF THE Puerto Rico CIVIL CODE

91.     Plaintiff repeats, reiterates and re-alleges each and every allegation contained in paragraphs 1 through 90, as if set forth in full herein.

92.     Co-defendants CMPR, Mrs. Gil, her husband and the legal partnership constituted among them, have through their negligent and willful acts caused Karen damages. Therefore, they are responsible for the damages suffered by her.

93.     Co-defendant Mrs. Gil is personally liable to the Plaintiff for all damages caused to her on account of her discrimination and retaliatory practices under Articles 1802 and 1803 of the Civil Code of Puerto Rico. As a result of the damages caused to Plaintiff, Plaintiff is entitled to an award of damages of no less than $1,000,000.00.

94.     In addition, in the event Defendants deny responsibility for the actions and damages claimed herein, pursuant to the provisions of Rule 44 of the Rules of Civil Procedure of the Commonwealth of Puerto Rico, the plaintiff would also be entitled to an award of prejudgment and post-judgment interest, to be computed from the amount finally adjudged to Plaintiff, plus a reasonable amount of attorney's fees, due to such obstinate and reckless denial.

**FOURTH CAUSE OF ACTION UNJUSTIFIED TERMINATION (Law 80)**

95.     Plaintiff repeats, reiterates and re-alleges each and every allegation contained in paragraphs 1 through 94, as if set forth in full herein.

96.     During all pertinent times alleged in this instant action, CMPR was plaintiff's employer subject to applicable labor laws.

97.     Plaintiff began working with CMPR on June 4, 2001.

98.     Plaintiff continued working for codefendant CMPR until September 1, 2011, when she was unjustly and discriminatorily fired.

99.     While plaintiff worked for codefendant CMPR, she always performed her tasks in the utmost professional manner, dedicated, diligently and efficiently.

100.     Plaintiff's termination was without just cause, and pursuant to Puerto Rico Act No. 80 of May 30, 1976 [29 L.P.R.A. §185(a) et seq.], her employer is legally obligated to compensate her in accordance with the law.

101.     Plaintiff's highest income was $53,822.00 annually. Since plaintiff worked for a period of ten (10) years, she would be entitled an allowance equal to three (3) months salary ($4,485.16.00 a month x (3) months= $13,455.50), and an additional progressive compensation equal to two (2) weeks for each year of service ($1,035.03.00 per week x 2 weeks x 10 years= $20,700.77), which totals $34,156.27, plus 25% in attorney's fees.

**PREJUDGMENT INTEREST, ATTORNEY FEES AND COSTS**

102.     Plaintiff repeats, reiterates and re-alleges each and every allegation contained in paragraphs 1 through 101, as if set forth in full herein.

103.    At the end of this action the Defendants will be liable to Karen for any pre judgment interest, attorney fees, and costs as permitted by law. 42 U.S.C. §1988; 42 U.S.C. § 2000e-16.

## VII.  RELIEF SOUGHT

**WHEREFORE**, premises considered Plaintiff demands that Judgment be entered by this Honorable Court in favor of Plaintiff and against the Defendants, for all relief prayed herein, granting all the sums requested; imposing the payment of all costs and expenses unto Defendants, granting Plaintiff any other relief she may be entitled as a matter of law, and awarding the Plaintiff pre-judgment and post judgment interest, plus a reasonable amount for attorney's fees.

**RESPECTFULLY SUBMITTED**, on this 2nd day of December of 2014.

**HEREBY CERTIFY** that on this date I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all attorneys of record.

> **MANUEL PORRO VIZCARRA**
> **LAW OFFICES**
> Calle Escorial 382
> Urb. Caparra Heights
> San Juan, P.R. 00920
> Telephone 787-774-8200
> Facsimile 787-774-8297
>
> **/S/MANUEL PORRO-VIZCARRA**
> USDC # 207006
> Email:  mpvlaw@centennialpr.net
>
> **/S/MYRMARIE LABORDE VEGA**
> USDC # 226107
> Email: ml@mpvlawpr.com

**/S/YESENIA M. VARELA COLON**
USDC # 220512
Email:  varelay@hotmail.com